IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL CORTEZ ROWE,

                Plaintiff,

      v.

TRISH ANDERSON, KAREN ANDERSON,
TRAVIS HAGG, PETAR KARNA and
DAVID SPANNAGEL,

                Defendants.[1]

OPINION and ORDER

14-cv-195-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se prisoner Michael Rowe is proceeding on two claims related to his conditions of confinement at the Columbia Correctional Institution:  (1) defendants Karen Anderson, Trish Anderson, David Spannagel, Petar Karna and Travis Hagg refused to provide appropriate treatment for his seizures from May 2013 to August 2013, in violation of the Eighth Amendment; and (2) defendant Karna disciplined plaintiff for complaining about Karna, in violation of the First Amendment.  Two motions are before the court:  (1) defendants' motion for summary judgment, dkt. #36; and (2) plaintiff's motion for assistance in recruiting counsel.  Because I conclude that plaintiff is not entitled to assistance in recruiting counsel and that no reasonable jury could find in plaintiff's favor even if I

---

[1]  In his complaint, plaintiff named "Nurse Trish," "Sgt. Hagg" and "Lt. Karna" as defendants.  I have amended the caption to reflect these defendants' full names, as identified by defendants in their summary judgment materials.

1

accept everything he alleges as true, I am denying his motion and granting defendants' motion.

From the parties' summary judgment materials and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

In 2006, plaintiff Michael Cortez Rowe began suffering from seizures. At that time, a physician at the University of Wisconsin Hospital prescribed topiramate as treatment.

From March 2011 until May 2014, plaintiff was incarcerated at the Columbia Correctional Institution. While plaintiff was incarcerated at the Columbia prison, staff consulted with plaintiff's physician regarding his treatment and adopted a "seizure disorder treatment care plan" in accordance with the physician's orders.

On May 7, 2013, defendant Trish Anderson, a nurse at the prison, received a report that plaintiff had "passed out" while sitting in bed. At that time, it had been a year since plaintiff had suffered a seizure. Anderson took plaintiff's vitals and determined that he was in stable condition. She told plaintiff to rest and provided naproxen for his headache. (Defendants say nothing about plaintiff's headaches in their proposed findings of fact, but plaintiff alleged in his complaint that his seizures were preceded by "cluster headaches."). In addition, security staff were instructed to monitor plaintiff "to make sure he did not have any further incidents." Dfts.' PFOF ¶ 29, dkt. #38. Finally, plaintiff was scheduled for an appointment with a prison doctor on May 16, 2013.

Later the same day, defendant Trish Anderson received a report that plaintiff's mattress was on the floor, soaked with urine.  After removing plaintiff from the cell and completing a medical assessment of plaintiff, Anderson contacted the on-call physician because this was plaintiff's second seizure in a 24-hour period.  The physician recommended that plaintiff be observed throughout the day and that he decrease stimuli and rest.  In addition, the physician recommended that plaintiff be seen by a doctor the next day. Plaintiff received clean linens and clothing.

On May 16, 2013, plaintiff was seen by the prison doctor.  (Defendants do not explain why plaintiff was not seen by a doctor the following day as recommended by the on-call doctor.  However, neither party says that plaintiff suffered any additional seizures before his appointment.)  During the appointment, plaintiff and the doctor discussed plaintiff's seizures, among other issues.  (The parties do not otherwise discuss what happened at the appointment, but plaintiff's treatment notes suggest that the doctor made adjustments to plaintiff's medication.)

On July 1, 2013,  plaintiff submitted a health service request in which he stated that he was having "bad health problems that he seriously needed medical attention for." Defendant Karen Anderson, the health services manager, responded to plaintiff's request. Anderson's duties included management and supervision of health care services provided, developing procedures, monitoring care plans and overseeing and responding to health service requests. However, she did not provide direct treatment to prisoners.  In her response to plaintiff, she noted that he was being treated by several doctors at the prison and she

3

directed him to continue to work with health care staff regarding his medical concerns.

On July 17, 2013, plaintiff had an appointment with "nursing staff" in a response to a complaint of a sore throat and cough.  (The parties do not say whether one of the defendants was involved with this appointment.)  During the appointment, plaintiff stated that he had suffered three seizures in May, four seizures in June and two seizures in July. (In his summary judgment submissions, plaintiff says that he had five seizures in June and six seizures between July 3 and July 9.  Dkt. #27 at 1.)  In addition, plaintiff stated that he had not been taking his seizure medication since June 12, 2013.  (Plaintiff provides different reasons for not taking his medication.  In one document, he says the medication was not working and a psychiatrist told him that the medication was not for seizures.  Dkt. #49.  In another document, he says that he was "allergic" to topiramate.  Dkt. #34.  In yet another document, he says that topiramate had side effects such as blurred vision, depression, breathing problems, muscle tremors and restlessness.  Dkt. #27.  In the same document, he says that he "was told" that topiramate would cause him to have more seizures, but he does not say who told him this.  Id.  The medical records do not support these allegations.  E.g., dkt. #44-1 at 103 (October 24, 2013 letter from neurologist recommending topiramate as seizure medication for plaintiff); id. at 13 (October 27, 2013 report from psychiatrist stating that plaintiff "continues to exercise poor judgment . . . by going off meds").)  The nurse instructed plaintiff to take his medication and scheduled a doctor's appointment the following week.

On July 25, 2013, plaintiff was seen by the doctor.  (The parties do not say what

happened at the appointment or whether the doctor made any changes or recommendations for treating plaintiff's seizures. However, plaintiff's progress notes indicate that the doctor made another medication adjustment and would consider a neurology consultation if plaintiff's symptoms did not improve. Dkt. #44-1 at 15.)

On August 3, 2013, a nurse (not a defendant) was called to plaintiff's cell after officers observed him lying on his cell floor. The nurse determined that plaintiff "may have had a seizure." By the end of her assessment, plaintiff appeared "greatly improved." The nurse gave plaintiff Tylenol for his pain and directed staff to monitor him.

Later the same day, an officer called the same nurse to plaintiff's cell because plaintiff appeared to be having a seizure. Plaintiff was taken to the hospital emergency room. (Defendants say that the nurse decided that plaintiff should go to the hospital; plaintiff says that it was an officer's decision.) At the hospital, clinical and diagnostic examinations of plaintiff were normal. The doctor prescribed dilantin (a different anti-seizure medication) and discharged plaintiff.

On August 8, 2013, a nurse (not a defendant) was called to plaintiff's cell because it appeared that he was having another seizure. Again, the nurse decided that plaintiff should be taken to the hospital and, again, the hospital's neurological examination of plaintiff did not show any abnormalities. The doctor prescribed an increased dose of dilantin.

On the evening of August 17, 2013, officers contacted defendant David Spannagel, a nurse at the prison who was on call that night, after an officer observed plaintiff face down on his mattress. Because Spannagel was not on site to conduct an assessment, he instructed

staff to take plaintiff to the hospital.  A doctor examined plaintiff but found nothing abnormal.  The doctor gave instructions that plaintiff should receive oxygen therapy each night and follow up with a neurologist to "discuss his seizure medication."  Dfts.' PFOF ¶ 38, dkt. #38. (Plaintiff's medical records show that the prison doctor sought a referral for a neurology consultation on September 3, 2013.  Dkt. #44-1 at 91.)

On August 20, 2013, around 1:30 a.m., defendant Petar Karna, a lieutenant at the prison, received a report that plaintiff might be having another seizure.  Both Karna and Spannagel came to plaintiff's cell but did not enter it at first.  After plaintiff refused an order to come to his cell window, Spannagel conducted a medical assessment in plaintiff's cell.  Plaintiff's vital signs were normal, his breathing was shallow and rhythmic and there were no signs of urinary or bowel incontinence or vomiting.  Spannagel gave plaintiff oxygen therapy.  (Defendants say plaintiff received oxygen therapy "for approximately 17 minutes," Dfts.' PFOF ¶ 57, dkt. #38; plaintiff says it was 20 minutes, dkt. #49.)  Although plaintiff did not respond verbally to Spannagel's commands, plaintiff's "body was responsive" and his pupils responded to motion when Spannagel held his eyelids open.  Dfts.' PFOF ¶ 58, dkt. #38.  Once plaintiff began responding verbally, Spannagel instructed plaintiff to "stay relaxed"; Spannagel instructed security staff to monitor plaintiff for additional symptoms.

Two hours later, defendants Spannagel and Karna returned to plaintiff's cell after receiving another report of a possible seizure.  Through plaintiff's window, Spannagel observed that plaintiff's arms and legs were stable, his breathing appeared similar to his breathing during the previous episode and he had not vomited.  Spannagel again directed

6

staff to monitor plaintiff closely and to inform the doctor of the situation in the morning. (Defendants say that Spannagel did not take additional action because plaintiff was in stable condition, he had recovered quickly after both episodes and he was able to answer questions. Plaintiff says that other prisoners told him that Spannagel asked defendant Karna whether to take plaintiff to the hospital and Karna refused, stating something about "saving money.")

Defendant Spannagel told defendant Karna that he believed plaintiff had faked his seizure.   Spannagel reached this conclusion "based on his experience in emergency services and witnessing many seizures." Dfts.' PFOF ¶ 64, dkt. #38.  For example, plaintiff's vitals were all within normal range; he recovered almost immediately; he did not have an elevated blood pressure or elevated heart rate; he did not bite his tongue; and his body was responsive to outside stimuli in that he flinched when Spannagel's hand would move quickly in front of plaintiff's face and his pupils reacted to movement when his eyelids were held open.   In Spannagel's experience, this was not typical of an individual that is having a seizure.  (Plaintiff says that an incident report includes a statement from Spannagel that plaintiff "was having a real seizure." Dkt. #34.  However, my review of the incident reports did not uncover that statement. Rather, the incident report says, "It was determined by RN Spannagel that inmate Rowe was more likely than not faking his seizure."  Dkt. #46-7. Plaintiff seems to read this sentence to mean that Spannagel believed that plaintiff was "not faking" but "more likely than not" means that Spannagel believed that plaintiff probably *was* faking.)

On August 26, 2013, defendant Trish Anderson performed a medical assessment on

plaintiff after receiving a report that he might be having a seizure. Plaintiff "had a response to pain stimuli" and his "eyes darted back and forth." Dfts.' PFOF ¶ 75, dkt. #38. Anderson determined that plaintiff did not require further medical attention, but she directed staff to monitor him every 15 minutes. In addition, plaintiff was placed in the fetal position to open his air passages and prevent him from asphyxiating on vomit. Anderson believes this was the appropriate way to treat plaintiff because "seizures are not a medical emergency in a person with a history of them. They are only deemed an emergency if [the person] experience[s] recurrent seizures (back-to-back) or a single seizure lasting more than five minutes." Dfts.' PFOF ¶ 77, dkt. #38.

On August 27, 2013, defendant Trish Anderson conducted a medical assessment of plaintiff after receiving a report that he might be having a seizure. Anderson's assessment was "normal" and plaintiff appeared to be in stable condition, so she determined that he did not need further medical attention. She directed staff to continue monitoring him. Anderson determined that this was the appropriate way to treat plaintiff because he did not have recurrent seizures or a single seizure lasting longer than five minutes. Further, plaintiff recovered from his seizure quickly and did not have a total loss of bowel and bladder control. Plaintiff also did not have a change in vital signs from his baseline.

The same day, defendant Karna issued a conduct report to plaintiff for disobeying orders and engaging in disruptive conduct. In the conduct report, Karna alleged that, on August 20, 2013, plaintiff had refused multiple directives to come to his cell door and that defendant Spannagel believed that plaintiff was faking his seizure. Karna wrote that

plaintiff's conduct had "caused the entire tier to be awakened and additional staff to report" to the unit.  Attached to the report was a letter written by Spannagel.  After summarizing what happened, Spannagel concluded in the letter that "there were not any symptoms that led me to believe [that plaintiff] had . . . a seizure.  My experience in emergency services and witnessing many seizures [and] the lack of corroborating signs and symptoms [led me to believe] that this event was not genuine."  After a hearing, plaintiff was found guilty of both charges and he received 60 days in disciplinary segregation.

On August 28, 2013, a nurse (not a defendant) performed a medical assessment on plaintiff after receiving a report that he may be having a seizure.  The nurse contacted the on-call doctor, who concluded that plaintiff could be returned to his cell and monitored.

Later, the same day, the same nurse received a report that plaintiff may be having a seizure.  The nurse determined that plaintiff should be taken to the emergency room because this was plaintiff's second seizure in a 24-hour period.  At the hospital, the doctor recommended an increase in the evening dose of dilantin and "a repeat neurology consult" to determine whether plaintiff was suffering from "pseudoseizures" or "genuine" seizures.  Dfts.' PFOF ¶ 88, dkt. #38.  (The parties do not explain what "pseudoseizures" are.  According to the Epilepsy Foundation, pseudoseizures, or "Psychogenic nonepileptic seizures," are "attacks that may look like epileptic seizures, but are not caused by abnormal brain electrical discharges. They are a manifestation of psychological distress. . . . A physician may suspect PNES when the seizures have unusual features such as type of movements, duration, triggers and frequency."  http://www.epilepsy.com/article/2014/3/truth-about-

psychogenic-nonepileptic-seizures.)

On August 29, 2013, a nurse (not a defendant) determined that plaintiff should be returned to the emergency room after she received a report that plaintiff was suffering from a seizure. On the way to the hospital, plaintiff appeared to suffer from another seizure. At the hospital, the doctor gave plaintiff a neurological exam, which did not show any abnormalities. Because plaintiff did not exhibit the symptoms of someone who had experienced a seizure, the doctor recommended that he be seen by a neurologist.

(Plaintiff says that he suffered another seizure on August 31, 2013 and that defendant Hagg failed to provide appropriate treatment. Defendants deny that plaintiff had a seizure on August 31.)

In a grievance dated August 31, 2013, plaintiff alleged that he was not getting adequate medical treatment for his seizures. The grievance was denied on the ground that plaintiff was receiving appropriate treatment.

On October 24, 2013, plaintiff was seen by a neurologist at the University of Wisconsin Hospital. The doctor concluded that plaintiff likely was suffering from a combination of "pseudoseizures" and "genuine" seizures. In support of this conclusion, he noted a number of "suspicious" factors, including recurrent seizures in a single day, very lengthy seizures, seizures recurrently associated with urinary incontinence and seizures associated with stool incontinence. However, because plaintiff had suffered some injuries during his seizure activity, the doctor believed that at least some of the time, plaintiff may have been suffering from a genuine seizure. The doctor recommended an increase in

10

phenytoin and topiramate.

After August 2013, plaintiff did not suffer any more seizures while he was at the Columbia prison.

OPINION

A.  <u>Treatment for Plaintiff's Seizures</u>

1. <u>Scope of plaintiff's claims</u>

In his complaint, plaintiff's allegations focused on treatment related to four seizures that he suffered between May 2013 and August 2013.  In particular, he said that defendant Trish Anderson failed to provide appropriate medical treatment for his May 7 seizures; defendants Karna and Spannagel failed to provide appropriate medical treatment for his August 20 seizures; and defendant Hagg did not provide appropriate medical treatment for a seizure on August 31.  (Plaintiff's allegations in his complaint refer to August 19 rather than August 20, but he does not dispute defendants' proposed facts regarding the correct date.)  Although he complained more generally about his treatment between May and August 2013, I did not allow him to proceed on his more general claims because he did not tie any of those allegations to the defendants he named in his complaint.  The only exception was plaintiff's claim against defendant Karen Anderson, the manager of the health services unit, because plaintiff alleged that Anderson was responsible for failing to provide him appropriate care throughout the relevant time period.

After I issued the screening order, plaintiff neither sought reconsideration of that

decision nor sought leave to file an amended complaint.  However, in his summary judgment materials, plaintiff again raises other issues, such as an alleged failure by unspecified staff members on unspecified dates to help him as quickly as he would have liked after he suffered some of his seizures.  Because I did not allow plaintiff to proceed on those claims in the screening order and he still does not connect these issues to the defendants (or any identified individual), I decline to consider those claims

2.  Merits

To prevail on a claim for inadequate medical care under the Eighth Amendment, the plaintiff must show that a prison official was "deliberately indifferent" to a "serious medical need."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person.  Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening.  Id.  A medical need may be serious if it "significantly affects an individual's daily activities," Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997), if it causes significant pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).  "Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the risk by consciously failing to take reasonable measures.  Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997).

Thus, under this standard, plaintiff's claim has three elements:

(1) Did plaintiff need medical treatment?

(2) Did defendants know that plaintiff needed treatment?

(3) Despite their awareness of the need, did defendants consciously fail to take reasonable measures to provide the necessary treatment?

Defendants do not deny that plaintiff's seizures were a serious medical need, so I need not consider that issue.  King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012).  Rather, defendants argue that they did not consciously fail to take reasonable measures to provide appropriate treatment.  I will consider the evidence with respect to each defendant in turn.

a.  Trish Anderson

1) May 7, 2013

Defendant Trish Anderson responded to two of plaintiff's seizures on May 7, 2013. At the time of the first seizure, plaintiff had not had a seizure for a year.  After the first seizure, Anderson instructed plaintiff to rest after she took his vitals and determined that he was in stable condition.  She also instructed security staff to monitor him for further incidents.  Finally, she scheduled a doctor's appointment for the following week. After the second seizure, Anderson contacted the on-call physician, who also recommended decreased stimuli, rest, monitoring and followup by a physician.

Plaintiff seems to believe that defendant Anderson should have done more, but he does not say what that "more" is.  He does not suggest that a person like himself with a

known seizure disorder should be taken to the emergency room every time he has a seizure, a proposition that is not supported by any evidence in the record.  See also  National Health Service, "What to do if someone has a seizure" ("[P]eople with epilepsy don't need to go to hospital every time they have a seizure."), available at http://www.nhs.uk/Livewell/Epilepsy/Pages/Ifyouseeaseizure.aspx.   Particularly because plaintiff's vital signs did not indicate that he needed emergency care and he did not appear to be in distress after either of the seizures, I see no grounds for inferring that Anderson acted unreasonably.

There is a stronger argument that additional treatment was needed after the second seizure.  After all, defendants acknowledge that one warning sign of a more serious problem is having multiple seizures in one day.  However, defendant Anderson *did* do more the second time: she contacted the on-call doctor and followed his advice.  It is well established that a nurse is entitled to rely on a doctor's instructions unless it is obvious that the doctor's advice will harm the prisoner.  Holloway v. Delaware County Sheriff,  700 F.3d 1063, 1075-76 (7th Cir. 2012); Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010).  Because plaintiff does not identify any reason it should have been obvious to Anderson that the doctor was giving bad advice, Anderson cannot be held liable under the Eighth Amendment.

The only wrinkle is that the on-call doctor recommended that plaintiff be seen by a doctor the following day, but plaintiff did not receive the doctor's appointment for another week.  Plaintiff does not allege that the delay was Anderson's or any other defendant's fault.  Even if it was, plaintiff does not allege that he suffered any seizures or was otherwise harmed

by the delay.  Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental.") (internal quotations omitted); Roe v. Elyea, 631 F.3d 843, 863-64 (7th Cir. 2011) ("A successful § 1983 plaintiff . . . must establish not only that a state actor violated his constitutional rights, but also that the violation caused the plaintiff injury or damages."). Accordingly, I conclude that defendant Anderson is entitled to summary judgment on this claim.

2)  August 26 and August 27, 2013

        Defendant Trish Anderson responded to reports of plaintiff having a seizure on both of these days.  In both cases, Anderson conducted medical assessments of plaintiff and determined that he did not need emergency care, in part because his vital signs were normal and because he recovered quickly from his seizures.  Plaintiff said nothing about these incidents in his complaint and he does not allege in his summary judgment materials that he required additional medical care on those days.  Accordingly, it is unnecessary to consider these incidents.

        Plaintiff includes a new allegation in his summary judgment materials: that defendant Anderson left him in soiled clothes on August 26 and 27.  However, that allegation is outside

the scope of this lawsuit because plaintiff did not include it in his complaint.  Even if he had,

he does not allege that he had to wait a long time before he received new clothes or that he

suffered anything more than short term discomfort as a result of Anderson's alleged conduct.

Although I do not doubt that wearing soiled clothes even for a short time is an unpleasant

experience, a violation of the Eighth Amendment requires more extreme conduct.  Hudson

v. McMillian, 503 U.S. 1, 8-9 (1992)("[E]xtreme deprivations are required to make out a

conditions-of-confinement claim.  Because routine discomfort is part of the penalty that

criminal offenders pay for their offenses against society, only those deprivations denying the

minimal civilized measure of life's necessities are sufficiently grave to form the basis of an

Eighth Amendment violation.").


b.  David Spannagel and Petar Karna

        Plaintiff's allegations against defendants Spannagel (a nurse at the prison) and Karna

(a lieutenant) focus on two events that occurred early in the morning on August 20, 2013.

(Spannagel also responded to an apparent seizure on August 17, 2013, but plaintiff says

nothing about that incident, presumably because Spannagel instructed staff to take plaintiff

to the hospital then.)  Plaintiff believes that defendants violated his rights by choosing not

to take him to the hospital after he suffered from what he says were two seizures.   In

addition, defendants gave him a conduct report after concluding that he was faking those

seizures.

        I will discuss the conduct report in the context of plaintiff's retaliation claim.  With

respect to plaintiff's Eighth Amendment claim, the question is not whether the conduct report was justified but whether defendants knowingly failed to provide plaintiff adequate treatment. Of course, if it is true that plaintiff was faking his seizures on August 20, then he did not require *any* treatment, much less a trip to the emergency room. Spannagel gives a number of reasons why he believes that plaintiff was not having a seizure on August 20. For example, plaintiff recovered quickly and his body responded to outside stimuli during the incident.

Plaintiff repeats throughout his filings that Spannagel is not a neurologist. Spannagel says that he was qualified to make the assessment because of his "experience in emergency services" and because he had "witness[ed] many seizures." Dfts. PFOF ¶ 64, dkt. #38. In addition, the neurologist who examined plaintiff in October 2013 provided some support for Spannagel's conclusion when he stated that many of plaintiff's seizures seemed "suspicious" because his symptoms were atypical. Dkt. #44-1 at 104.

Obviously, a health care professional must be very careful before deciding to deny treatment on the ground that a patient is manufacturing symptoms. However, even if I assume that defendant Spannagel was wrong in concluding that plaintiff was faking a seizure, that is not the end of the matter. The question is not whether Spannagel made a mistake in diagnosing plaintiff's condition, but whether he and defendant Karna knowingly denied plaintiff needed care. If defendants had simply ignored plaintiff, he would have a stronger claim. However, defendants did not ignore plaintiff after either incident. Rather, after the first incident Spannagel gave plaintiff oxygen therapy. After both incidents,

Spannagel conducted a medical assessment, found normal vital signs, stayed with plaintiff until he recovered and directed staff to continue monitoring him.

Again, there is no evidence in the record suggesting that plaintiff needed to be taken to the emergency room every time he had a seizure.  When plaintiff *was* taken to the hospital, the doctors there did not suggest that plaintiff's situation was dire.  While at the hospital, plaintiff often received little additional care compared to what he received at the prison.  In fact, defendant Spannagel had directed staff to take plaintiff to the hospital only three days earlier on August 17; the only directions from hospital staff were to give plaintiff oxygen therapy and review his medications with a neurologist.  Thus, it is not clear what taking plaintiff to the hospital would have accomplished.  Even when plaintiff was taken to the hospital later in August, the medical records do not suggest that emergency care was required.  In other words, no reasonable jury could find that defendants Karna and Spannagel consciously refused to provide plaintiff with needed medical treatment.

Plaintiff makes much of allegation that other prisoners informed him that defendant Karna stated on August 20 that plaintiff should not be taken to the hospital to "save money."  Plaintiff did not submit affidavits from the other prisoners, so his allegations are hearsay.  Fed. R. Evid. 801 and 802.  However, even if I accept the allegations as true, they would not permit a reasonable jury to find in plaintiff's favor on this claim.

As an initial matter, considering the cost of treatment is not necessarily inappropriate under the Eighth Amenment.  Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999) ("[T]he civilized minimum [of medical care required by the Eighth Amendment] is a

function both of objective need and of cost.").  Particularly because plaintiff had been taken to the emergency room multiple times in the days leading up to August 20 and those visits had done little to improve plaintiff's condition or generate helpful treatment solutions, it would not necessarily be unreasonable to consider whether another trip to the emergency room was worth the cost.  In any event, statements such as Karna's suggesting that a defendant had nonmedical motivations for his decision are not relevant to an Eighth Amendment analysis unless the defendant's conduct was objectively unreasonable.  Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866 (7th Cir. 2013).  In other words, it does not matter what a defendant's motive was if the plaintiff got all care to which he was entitled.  Because there is no evidence in this case that plaintiff needed emergency care on August 20, defendant Karna's alleged statement does not show that Karna or Spannagel violated the Eighth Amendment.

c.  Travis Hagg

        I allowed plaintiff to proceed on a claim that defendant Hagg failed to provide any treatment for plaintiff after he suffered a seizure on August 31, 2013.  (Although defendants deny that plaintiff suffered a seizure on that date, I will accept as true plaintiff's allegation that he did.)  In his summary judgment materials, plaintiff says nothing about an alleged failure by Hagg to provide treatment *after* plaintiff suffered a seizure.  Rather, plaintiff makes a new allegation that he "told Hagg that [plaintiff] must see [health services staff] for oxygen treatment but no nurse was called because [Hagg] said it was about 12 or 1 a.m."  Dkt. #49

at 2.  Plaintiff says he then "had a seizure from the headache."  Thus, now plaintiff seems to be blaming Hagg for failing to *prevent* a seizure rather than failing to provide treatment after a seizure.

Because I did not allow plaintiff to proceed on the claim he is raising now, it is outside the scope of this lawsuit.  In any event, plaintiff's new allegation does not state a claim under the Eighth Amendment.  Plaintiff is not alleging that any prison staff were failing to comply with recommendations by hospital staff to provide oxygen treatment to him.  Rather, he is alleging that defendant Hagg denied a request to call in a nurse in the middle of the night because plaintiff believed that oxygen treatment would be helpful.  That allegation is not sufficient to show that Hagg was disregarding a substantial risk of serious harm to plaintiff's health.

First, I see no evidence in the record that oxygen therapy could prevent an imminent seizure from occurring.  After all, plaintiff does not allege that he had used oxygen therapy that way in the past.  Even if I assume that oxygen therapy could help, Hagg could not be held liable unless he knew this *and* he knew of a substantial risk that plaintiff would be seriously harmed without oxygen therapy *and* Hagg had reason to believe that appropriate medical staff could be summoned in time.  The record does not support of any of those propositions and plaintiff does not even allege them.  In fact, plaintiff does not provide any details about what he allegedly told Hagg on August 31 and he does not allege that he was harmed as a result of the seizure, so I cannot infer reasonably that defendant Hagg consciously disregarded a substantial risk to plaintiff's health.

20

d.  Karen Anderson

Defendant Karen Anderson, the manager of the health services unit, responded to one health service request from plaintiff dated July 1, 2013, in which plaintiff said generally that he was "having really bad health problems that . . . need medical attention." Dkt. #44-1 at 10.  He asked to be "sent[] to UW-Hospital for a medical exam." Id.  Plaintiff did not specify the nature of his medical problems.  In response to plaintiff's request, Anderson wrote that plaintiff had been "evaluated" by three different doctors and she directed him to "continue to work with [the health services unit] regarding [his] multiple concerns." Id.

Perhaps defendant Anderson could have questioned plaintiff further so that she could better determine what his particular concerns were.  However, even if Anderson could have done more, that is not enough to show that Anderson violated the Eighth Amendment, which requires proof that a defendant consciously disregarded a substantial risk to plaintiff's health.  To begin with, plaintiff's request says nothing about his seizures.  Further, at the time he wrote his July 1 request, prison records did not show that he had continued to suffer from seizures after May.  (Although plaintiff says now that he had seizures in June as well, he did not inform health care staff of those incidents until after Anderson received his health service request.)  Thus, Anderson had no reason to believe that plaintiff needed more treatment for his seizures.

Plaintiff seems to blame defendant Anderson for not personally responding to all of his health service requests and more generally for failing to provide more treatment for his seizures.  With respect to plaintiff's health service requests, Anderson cannot be held liable

21

for failing to respond to requests she did not see.  <u>Farmer</u>, 511 U.S. at 837 (defendant cannot be held liable under Eighth Amendment unless she was actually aware of risk to prisoner; not enough to show that defendant "should have known" about risk).  The Eighth Amendment does not prohibit an official from delegating tasks.   <u>E.g.</u>, <u>Burks v. Raemisch</u>, 555 F .3d 592, 595 (7th Cir. 2009); <u>Greeno v. Daley</u>, 414 F.3d 645, 656 (7th Cir. 2005). Further, plaintiff does not identify any particular problems with the way health services staff responded to his health service requests.  Those responses show that health services staff scheduled a doctor's appointment for plaintiff when he had concerns about the treatment he was receiving for his seizures.  Dkt. #44-1 at 7-8, 29, 34, 43. Plaintiff does not allege that any of the defendants prevented him from seeing the doctor or that doctors failed to provide appropriate care during his appointments.

    With respect to plaintiff's more general complaint that defendant Anderson did not do enough to treat his seizures, Anderson says that her position is primarily administrative; she was not responsible for deciding what treatment a prisoner should receive.  Dfts.' PFOF ¶¶ 23-25, dkt. #38.  However, even if I assume that Anderson could have done more, plaintiff does not say specifically what he believes that Anderson should have done.

    It may be that plaintiff believes that he should have been sent to see a neurologist sooner.  One of his health service requests suggests that is what he wanted.  Dkt. #44-1 at 21.  However, if Anderson did not have authority to make medical decisions, she would not have authority to make referrals.  Rather, it appears that the doctors were responsible for requesting a referral.  In fact, it is a prison doctor who requested such a referral on

September 3, 2013.

Plaintiff says nothing in his summary judgment submissions about any of the doctors at the prison who treated him. In fact, neither side provides many details regarding the doctor appointments plaintiff had. Regardless, if plaintiff does not allege that one or more of the prison doctors unreasonably refused to request a referral to see a neurologist, I cannot make the argument for him.

Even if I assume that defendant Anderson (or any of the defendants) had the authority to make a referral, the failure to make a referral sooner would not violate the Eighth Amendment. Before August 2013, defendants' records do not show consistent complaints by plaintiff that he was having seizures. Although plaintiff says now that he was having seizures throughout May, June and July, he does not allege that he complained to medical staff at the time.

Perhaps there is an argument that plaintiff should have received a referral in August 2013, when he began complaining of seizures more frequently. However, no reasonable jury could find that the decision to wait until September 3 to request a neurology referral violated the Eighth Amendment. First, although hospital doctors began recommending a neurology consultation in August 2013, they did not suggest that plaintiff was in any imminent danger. Thus, I see no basis for concluding that a delay of a few weeks rises to the level of a constitutional violation. McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010) ("Delay is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.").

Second, the only recommendation the neurologist made was an adjustment to plaintiff's medication, something that prison medical staff had already been doing in conjunction with recommendations from emergency room doctors. Thus, prison medical staff were not simply persisting in a course of the same ineffective treatment.  Finally, even if prison medical staff had requested a referral in August rather than September, doing so would not have prevented any of plaintiff's seizures.  It took almost two months for a neurologist to see plaintiff after the prison doctor requested a referral, which means that it is unlikely that plaintiff would have been seen by a neurologist before the end of September even if prison medical staff had requested a referral in August.  Because plaintiff had no more seizures after August 2013—either because of successful adjustments to plaintiff's medication or another, unknown reason—a September neurology appointment would not have made any difference for plaintiff.  For all of these reasons, I conclude that plaintiff cannot prevail on a claim that defendant Anderson or anyone else violated plaintiff's Eighth Amendment rights by failing to take additional measures to prevent him from having more seizures.

## C.  Conduct Report

I understand plaintiff to be contending that defendant Karna violated the First Amendment by giving plaintiff a conduct report on August 27, 2013.  Although Karna says that he gave plaintiff the conduct report because Karna believed that plaintiff had faked a seizure, plaintiff says that Karna actually was retaliating against him for writing to the warden about Karna's alleged refusal to take plaintiff to the hospital on August 20, 2013 in

order to save money.

Plaintiff is vague in his summary judgment materials regarding the timing of his letter, but he alleged in an August 31, 2013 grievance that he sent the letter on August 21, 2013, several days before he received the conduct report.  Dkt. #45, exh. 114.  Although neither side submitted a copy of plaintiff's letter to the warden, I will assume for the purpose of defendants' motion for summary judgment that he sent the letter on August 21.  (I need not consider whether plaintiff's August 31 grievance played a part in Karna's decision to issue the conduct report because plaintiff did not file the grievance until several days after plaintiff received the conduct report.  )

To prevail on a retaliation claim, plaintiff must do more than show that defendant Karna made a mistake in giving plaintiff a conduct report.  Rather, plaintiff must show Karna issued the conduct report *because* plaintiff complained about Karna.  Gomez v. Randle, 680 F.3d 859, 866-67 (7th Cir. 2012); Bridges v. Gilbert, 557 F.3d 541, 555-56 (7th Cir. 2009).  Plaintiff cannot make that showing for two reasons.

First, defendant Karna says he did not even know that plaintiff had complained about him at the time Karna issued the conduct report.  Dfts.' PFOF ¶ 72, dkt. #38.  Obviously, plaintiff's letter could not be one of the reasons that Karna disciplined plaintiff if Karna did not know about the letter at the relevant time.  Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.").  To the extent that plaintiff believes that Karna is lying about his lack of knowledge, I see no evidence in

the record or even allegations undermining Karna's testimony.  Plaintiff does not allege that he sent a copy of the letter to Karna and he does not allege that the warden took any action on his letter before August 27.  In fact, plaintiff does not allege that the warden ever responded to his letter, so it seems unlikely that the warden showed the letter to Karna.

Second, it is undisputed that it was defendant Spannagel, not defendant Karna, who made the determination that plaintiff was faking his seizures on August 20.  Karna simply relied on that determination, as he was entitled to do.  Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel.").  Because plaintiff does not allege that he complained about Spannagel in his letter, Spannagel would have no reason to even know about the letter, much less retaliate against plaintiff for writing it.

In his summary judgment materials, plaintiff says that the conduct report is suspicious because defendant Karna did not prepare the report until August 23 and did not give it to plaintiff until August 27.  He says that is suspicious because, "whenever [he] got a [conduct report, he] got it the following day, not 7 days later." Dkt. #49 at 2.  However, he does not explain why the allegedly unusual delay is evidence of a retaliatory motive. Presumably, plaintiff's theory is that Karna did not become aware of plaintiff's letter right away and that he issued the conduct report only after learning of the letter.  Not only does plaintiff have no evidence to support his implausible theory, but the theory is contradicted by the conduct report itself.  Attached to the conduct report is a letter dated August 22 from defendant Spannagel in which he explains why he believes that plaintiff was faking a seizure

26

on August 20.  Because defendant Karna relied on the letter to draft his report, it is not surprising that the report is dated August 23.  Further, the conduct report shows that it was not approved by the security director until August 26, which explains why plaintiff did not receive the report until August 27.  In sum, I see no evidence or even allegations supporting the view that defendant Karna gave plaintiff a conduct report because plaintiff complained about Karna.  Accordingly, I am granting summary judgment to Karna on this claim.

### D.  Assistance in Recruiting Counsel

At the same time plaintiff filed his opposition to defendants' summary judgment motion, plaintiff filed his fourth motion for assistance in recruiting counsel.  I denied plaintiff's previous requests both because he had not shown that he made reasonable efforts to find a lawyer on his own, Jackson v. County of McLean, 953 F.2d 1070 (7th Cir. 1992), and because he had not shown that the complexity of the case exceeded his ability to litigate. Pruitt v. Mote, 503 F.3d 647, 654-55 (7th Cir. 2007).

Plaintiff still has not complied with the court's request to submit letters from lawyers who have declined to represent him.  However, even if I overlook this problem, I am not persuaded that plaintiff is entitled to assistance in recruiting counsel for the purpose of relitigating summary judgment.

Plaintiff says that he needed a lawyer to help prepare his summary judgment materials because he does not know anything about the law and he does not know how to comply with the court's summary judgment procedures.  To some extent, plaintiff's assertion is borne out

by his summary judgment filings.  Despite multiple attempts, plaintiff failed to comply with the court's summary judgment procedures in a number of different respects.   In addition, plaintiff did not cite any law in his summary judgment filings.

Despite his limitations, however, plaintiff had no difficulty giving his side of the story, telling the court when he disagreed with defendants' version of the facts and explaining why he believed that defendants violated his rights.  As should be clear from this opinion, I treated all of plaintiff's allegations as true for the purpose of deciding defendants' motion, even though most of those allegations were not supported with admissible evidence. Thus, plaintiff's lack of legal knowledge and difficulty complying with court procedure are not the reasons that I am granting defendants' motion for summary judgment.  Rather, the problem was that, even if plaintiff's allegations are true, they do not support an Eighth Amendment claim.  Because the medical records speak for themselves (and plaintiff does not allege that any records are missing or falsified), I see no way that plaintiff could prevail in this case, even if he had a medical expert and an experienced lawyer.   In sum, plaintiff was not prejudiced by the lack of counsel, so it would make no sense to appoint a lawyer simply to reach the same result.

I recognize that a determination regarding prejudice generally is reserved for appellate review.  Pruitt, 503 F.3d at 659.  However, in a case like this one in which the parties have fully briefed a motion for summary judgment and both sides have had a fair opportunity to present their case, it would be irresponsible to ignore the evidence available to the court. Appointing counsel in a case like this one in which there is no reasonable possibility that a

28

lawyer would make a difference in the outcome of the case would be a waste of resources for all involved.   Accordingly, I am denying plaintiff's motion for assistance in recruiting counsel.

ORDER

IT IS ORDERED that

1.  Plaintiff Michael Cortez Rowe's motion for assistance in recruiting counsel, dkt. #48, is DENIED.

2.  The motion for summary judgment filed by defendants Trish Anderson, David Spannagel, Petar Karna, Travis Hagg and Karen Anderson, dkt. #36, is GRANTED.

3.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 28th day of January, 2016.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

29